UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
---------------------------------X
                                  :
Jean-Gabriel Bernier              :
29463-054                         :
FCI Allenwood                     :
P.O. Box 2000                     :
White Deer, Pa. 17887             :
                                  :       COMPLAINT PURSUANT
                    Plaintiff,    :              TO
          V.                      :       5 U.S.C. § 702 AND
                                  :            BIVENS
Barack Hussein Obama,             :
President of the United States;   :

Loretta Lynch,                    :
Attorney General of the United States;
                                  :
Charles E. Samuels,
Director of the Federal Bureau of Prisons;

Angela P. Dunbar,                     Case: 1:16-cv-00828
Asst. Director, Programs, FBOP;       Assigned To : Unassigned
                                      Assign. Date : 5/3/2016
Bradley T. Gross,                     Description: Pro Se Gen. Civ.
Asst. Director, Administration, FBOP;

Jeff Allen,
Chief Physician, FBOP;

Gilead Sciences, Inc.             :
                    Defendants.
---------------------------------X

INTRODUCTION

    This is a civil rights action filed by Jean-Gabriel Bernier,
a federal prisoner in the custody of the Federal Bureau of Prisons
(BOP). The complaint contains two causes of action, each containing
two claims. The first cause challenges the BOP policy criteria for
treatment of prisoners diagnosed with Hepatitis C; and additionally
challenges the inability of the Plaintiff to participate in the
Patient Assistance Program sponsored by Gilead Sciences Inc, maker
of the drug Harvoni. The second cause challenges the BOP practice
of housing six men in a space constructed for four men; and the
criteria used to move men out of the six-man to a two-man cell based on



race, ethnicity, gang affiliation or geographic origin.

## JURISDICTION

1. The Court has jurisdiction to adjudicate this complaint pursuant to 28 U.S.C. § 1331; 5 U.S.C. § 702; 42 U.S.C. § 18116; and <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388 (1971)

## DEFENDANTS

2. Defendant President Obama is the chief executive officer of the federal government. The President is being sued in both his official and individual capacity.

3. Defendant Attorney General Lynch oversees the United States Justice Department of which the BOP is a component. Defendant Lynch is being sued in her official capacity.

4. Defendant Samuels as the Director of the BOP formulates and oversees the implementation of policy within the BOP. Director Samuels is being sued both in his official and individual capacity.

5. Defendant Dunbar is the Assistant Director of Correctional Programs for the BOP and is being sued in her official and individual capacity.

6. Defendant Gross is the Assistant Director of Administration for the BOP and is being sued in both official and individual capacity.

7. Defendant Jeff Allen is the Chief Physician of the BOP and is being sued in both his official and individual capacity.

(2)

8. Defendant Gilead Sciences, Inc. is the manufacturer of the drug Harvoni, a cure for Hepatitis C.

9. Defendants' addresses are provided in the attachment to this complaint.

## FACTUAL BACKGROUND

### A. MEDICAL CLAIM

10. The Plaintiff suffers from Hepatitis C, a virus transmitted primarily through the blood and which impairs the liver. It resides in liver cells(hepatocytes), where it replicates and causes cell death(necrosis). Milder forms of chronic hepatitis are non-progressive or only slowly progressive , while more severe forms may be associated with scarring(fibrosis) of the liver and structural reorganization of the liver, which when advanced, ultimately leads to cirrhosis, end-stage liver disease, liver cancer, ultimately liver failure and death.

11. Cirrhosis is marked by inflammation of the liver, degeneration of hepatocytes and their replacement with fibrotic scar tissue. In what is called compensated cirrhosis, the liver, although scarred, can still perform many of its important functions. When the liver becomes decompensated, there is so much fibrosis, that the liver can no longer function and symptoms such as bleeding from the blood vessels in the throat(esophageal varices), retention of large amounts of fluids around the stomach(ascites) and a brain disease that causes severe mental confusion(hepatic encephalopathy) develops at this

stage leading to liver failure.

12. Once a person is diagnosed with chronic Hep C, the approach is to monitor the functioning of the liver and the progression of disease and damage to the liver. The damage done is quantified based on Grade and Stage. Grade measures the level of inflammation in the liver and Stage measures the amount of fibrosis(scarring) of the liver. Grade is scaled from 0 to 3; 0 meaning no inflammatory activity, 1 meaning mild inflammatory activity; 2 meaning moderate, 3 meaning severe. Stage is scored from 0 to 4; 0 meaning no fibrosis, 1 meaning mild fibrosis, 2 meaning moderate fibrosis, 3 meaning bridging fibrosis and 4 meaning cirrhosis of the liver.

13. There are a number of diagnostic techniques used to monitor the progression of the liver damage. A liver biopsy studies a piece of liver tissue, 1/50,000th of the liver. This method is falling out of favor in the medical community as the microscopic piece studied might not be representative of the overall condition of the liver and the risks of the invasive procedure. There is also the ultrasound scan of the liver which studies the structure of the liver and any abnormalities. There is also a blood test called Fibrosure which measures certain blood markers and correlates their values to measure liver damage.

14. Liver enzymes are also measured periodically through blood tests. They are aminotransferase aspartate(AST) and alanine phosphatase(ALT). There are ranges within which someone tested will be considered normal and above which will be considered abnormal. A measure of disease progression has been developed called the APRI

(Aspartate aminotransferase-to-Platelet-Ratio-Index), this index is only specific and accurate in 75% of cases measured for cirrhosis.

15. The medical community standards as practiced by the private sector insurer UnitedHealth Care and the U.S. Veterans Administration, two major players in the treatment of Hep C, accept any and all of the above described tests indicating cirrhosis: liver biopsy, APRI, ultraound scan, Fibrosure. The BOP does not accept or perform the Fibrosure, using only the APRI as the gateway to any consideration for treatment.

16. In October, 2014, defendant Gilead Sciences was granted Food and Drug Administration approval to market a drug named Harvoni for the cure of Hepatitis C. Harvoni is a once a day pill costing about $1,000.00 each amounting to $94,000.00 for a twelve-week treatment.

17. Harvoni has produced amazing results with cure rates nearing 100% in patients similarly situated to Plaintiff: African-American, Genotype 1(most difficult to treat), prior null responder to previous treatment regimens.

18. When Plaintiff came into federal custody in June, 2015, he requested treatment with Harvoni. The Plaintiff submitted to his medical providers here at FCI Allenwood Fibrosure test results which indicated cirrhosis from 2012, 2014 and 2015. The plaintiff also gave the providers liver biopsy results from 2009 which showed Grade II, Stage II liver conditions. The request for treatment approval was submitted to defendant BOP Chief Physician Allen.

(5)

19. Defendant Allen denied the treatment with Harvoni stating that the Plaintiff did not meet the BOP priority criteria. The Fibrosure results were ignored even though the BOP policy states that the APRI should not be used if there is some other indication of cirrhosis. The basis for the decision not to treat by defendant ALLen were the biopsy results and the Plaintiff's low APRI number.

20. It is noted at this point that the progression of liver disease in chronic Hep C patients is more likely in patients who are older, with longer duration of infection and Genotype 1. Plaintiff is 59 years old, has been infected for at least twenty five years and is Genotype 1. Thus the use of a seven year old biopsy result and the rejection of a more recent, more accurate indicator of cirrhosis is irrational.

21. Moreover, the BOP's reliance on the APRI as the gateway to consideration for treatment goes against the medical evidence. The Plaintiff's AST levels, which is the primary factor in the calculation of the APRI, stays slightly above the upper range of normal. It follows that the Plaintiff's numbers will never reach the APRI number required by the BOP policy.

22. This does not necessarily mean that the Plaintiff's liver is not being severely damaged. There are Hep C patients like the Plaintiff who do not have high AST numbers but who nevertheless suffer from high inflammation of the liver and fibrotic damage as indicated by the results of the Fibrosure test done on Plaintiff.

23. The BOP policy and practice not to presently treat the Plaintiff allows continuing damage to be visited upon the Plaintiff's liver to the point of the damage being irreversable. At that point, treatment will not ameliorate the liver condition and will either lead to the need for a transplant or liver cancer.

24. Plaintiff presently suffers from nausea, gastric dysfunction, chronic fatigue, night sweats and insomnia. Should the Plaintiff eradicate the virus now, the liver damage already done to the liver will most likely be reversed and the painful symptoms which the Plaintiff suffers as a result of the present liver damage will cease to exist.

25. It can not be argued with a straight face that the purpose of erecting such an insurmountable treatment criteria in the BOP policy is designed on community medical standards and not on avoiding the costs of the Harvoni treatment by denying mostly all prisoners who presently suffer from Hep C. If the cost of the Harvoni treatment was §100.00, everybody with Hep C would be treated. With cost being the BOP engine for the policy, the Plaintiff requested of both the BOP and Gilead Sciences that he be allowed to participate in the Gilead Patient Assistance Program which is offered by Gilead for those unable to afford the costs of the treatment.

26. The response from the BOP and Gilead is that after consulting with each other decided that prisoners would not be allowed to participate in the assistance program. On hte one hand, the BOP refuses to treat the Plaintiff based on costs and on the other refuses to allow the prisoner to participate in the Patient Assistance

(7)

Program.

27. Subsequent to the FDA approval of Harvoni, the FDA has approved three other drugs for the treatment of Hepatitis C. One in particular, Zepatier, manufactured by Merck has been priced 40% lower than the drug Harvoni. The BOP, for whatever reason, has not been proactive with the drug companies to attempt to obtain the drugs at a price at which the prisoners in their care can be treated without busting the BOP budget. This inaction leaves the Plaintiff with no recourse.

27a. Hepatitis C is the most pervasive, bloodborne viral infection in the United States. Its concentration is markedly higher in the prison population. It is noted that the prison population in the BOP is disproportionately black and thusly there is a higher number of black prisoners suffering from this ailment.

### B. SIX-MAN CELLS

28. Plaintiff has been in prison since June 26, 1990, when he was arrested by New York state authorities on robbery charges. Then the Plaintiff was arrested by federal authorities on a set of different bank robbery charges and ultimately sentenced to 35 years imprisonment by the federal court. The Plaintiff was then sentenced to 25 years imprisonment by the state court.

29. In 1992, Plaintiff commenced service of the federal sentence at USP Lewisburg and was subsequently housed at USPs Atlanta, Beaumont and Allenwood. In 2003, Plaintiff was sent back to state custody where he served the state sentence at Clinton, Attica, Shawangunk, Elmira, Greenhaven and Auburn maximum security prisons. In June, 2015 the Plaintiff was returned to federal custody and designated to serve the rest of the federal sentence at FCI Allenwood, a medium security facility. This is the Plaintiff's first experience ever in a medium security facility.

30. Plaintiff knew that in coming back to federal custody that he would have to readjust to being double celled, after having been single celled the previous twelve years in state custody. The Plaintiff had no idea what was coming. Upon arrival at FCI Allenwood, the Plaintiff was placed in a six-man cell, two two-man cells which were converted into one space to house six men. With the two beds added and two lockers added and two chairs added, there is literally no personal space to move around in.

31. It is noted that the BOP rates the capacity of living space with a formula which divides the space by a certain number to arrive at the number of men that could be housed in that space. The space configuration of the six-man cells when subjected to the formula directs that only four men be housed in that space. In order to circumvent that formula, approval must be obtained explicitly from defendant Asst. Director Dunbar and defendant Asst. Director Gross. And ultimately defendant Samuels must also approve the conversion of space to house more men than it is rated for by formula.

32. Defendant President Obama had the opportunity to observe and experience the inadequateness of space converted to house more men than what it was rated for. The President visited the medium security FCI at El Reno, Oklahoma in July, 2015. The chief executive officer of the federal government stepped into a cell which was converted to house three men in space rated for two men. President Obama had a visceral, incredulous reaction and stated "You got three grown men living in here". The President could not believe

(9)

that in our modern advanced society that prisoners, human beings, could be forced to live in such degrading conditions.

33. Thus far the Plaintiff has had to suffer the conditions of the six-man cell for over six months, much longer than anybody else and purposely made longer by staff due to the Plaintiff's filing for administrative remedy. The Plaintiff has been confined with five other men with no personal space for privacy to conduct one's personal functions.

34. It is not just the space issues which are unbearable for a long period of time. The lack of proper ventilation renders the cell stifling in the summer and freezing cold in the winter time, as the system was not configured for the present arrangement.

35. Another attendant condition is the addition of thirty men to the unit housed in the six six-man cells. The infrastructure of the unit was not configured with that many men in mind. This creates an environment of excess noise and chaos from six in the morning til ten at night. This is 30 extra men in the unit taxing the use of the phones, micrwaves, computers and televisions. There is a resultant tension and animosity which deprives a prisoner of the opportunity to find some peace of mind.

36. The sanitary conditions in the six-man cell are likewise problematic with six different men having different standards of cleanliness and home training. Urine can sometimes be observed around the toilet bowl and fecal matter in the bowl. This creates tension in the cell as these type of dudes don't want to be told

(10)

what to do. Altercations occur when the doors lock. There's no intervention forthcoming from the one officer in the unit, who can't open the door any way after lock-in by himself.

37. Lastly, different men have different sleeping habits. We lock in at 10 p.m. and have to be up at 6:00 a.m. the next morning. You have men that do not go to sleep until the wee morning hours, up and about talking and making noise. This situation produces sleep deprivation in the Plaintiff. This is especially detrimental to the Plaintiff as his chronic condition leaves him chronically fatigued as it is.

38. Upon arrival at FCI Allenwood and being assigned to the six-man cell, the Plaintiff expressed reservations to staff. The Plaintiff was then told by staff that it wouldn't be for more than a few weeks. So, the Plaintiff, not wanting to start this journey on a negative note, acquiesced to the six-man cell housing.

39. Then as the Plaintiff got familiar with his surroundings, he started noticing discrepancies with the housing assignments. Prisoners would get off the bus and within a couple of days would be assigned to a two-man cell. What Plaintiff would come to learn is that prisoners dictated the cell assignments. If a prisoner's cellmate in a two-man cell got transferred, went to the box or whatever, that cell would remain with just one prisoner in it until that prisoner elected to allow someone to move in with him by signing off on a cop-out and submitting it to staff.

40. Then the prisoner observed that the housing assignments

(11)

were being made on the basis of racial, ethnic, geographical or gang affiliation. When the Plaintiff confronted staff with his observations, meaning his counselor, the Unit Manager and the Warden, the Plaintiff was told that it was done in that manner to avoid conflicts between prisoners. The Plaintiff was further told that doing it by means of a list, based on time of arrival would lead to fights as they would have to house blacks, hispanics and whites in the same two-man cell.

41. The warden of FCI Allenwood told the Plaintiff face to face that although he would never commit to paper the practice of basing the housing assignments on those criteria aforementioned, that the defendant Director Samuels and defendants Asst. Directors Dunbar and Gross condoned the manner of basing housing assignments on those criteria as it avoided conflicts at FCI Allenwood and other BOP facilities. The Plaintiff was taken aback that the federal government would tacitly endorse segregation and separation amongst different groups.

42. All cell assignments and movement are keyed into the BOP Sentry computer system. Reference to those records will substantiate the Plaintiff's assertions if checked from August 2015 for the Plaintiff's unit up to the present and the records for any other unit in a BOP facility. This practice is nationwide.

43. The records for the Plaintiff's unit will evidence that prisoners who have transferred into the facility subsequent to the

Plaintiff's arrival are moved from the six-man to a two-man while the Plaintiff remains in the six-man. The Plaintiff does not subscribe to the criteria or manner that the BOP is handling the housing assignments :: from the six-man cells to a two-man cell.

44. Further, it will be shown that whites are housed with whites in the two-man cells, hispanics with hispanics and blacks with blacks. And of course, thes blacks are relegated to spend the most time in the six-man cells as the hispanics and whites "<u>control</u>" more cells. These circumstances are a far cry as compared to when the Plaintiff left USP Lewisburg to go to state custody in 2003.

## FIRST CAUSE OF ACTION
## CLAIM I

45. The decision by defendant Allen to deny Plaintiff treatment for Hepatitis C pursuant to the BOP treatment gudelines and allowing the Plaintiff to suffer from the delibitating effects of the ailment is in dereliction of the BOP's statutory duty to provide Plaintiff with necessary and adequate medical care and is an arbitrary and capricious exercise of authority in violation of the Administrative Act, 5 U.S.C. § 701 et seq.;

46. This decision is likewise constitutionally infirm as it exposes the Plaintiff's health to future fatal harm through the dysfunction of his liver and deprives the Plaintiff the opportunity to arrest and reverse the damage being done by the presence of the virus, which present damage causes the Plaintiff nausea, gastric dysfunction, chronic fatigue, insomnia and night sweats, in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution.

## CLAIM II

47. The decisions by defendant BOP Director Samuels not to pursue an arrangement with the pharmaceutical companies allowing the treatment of BOP prisoners with Hepatitis C and not allowing prisoners the opportunity to participate in the patient assistance programs for those unable to afford the drugs sponsored by defendant Gilead and others based on race, age and statas as a prisoner is in violation of 42 U.S.C. § 18116 and the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION

### CLAIM I

48. The approval, designation, implementation and acquiescence by defendants Obama, Samuels, Dunbar and Gross of the policy and practice of using multiple occupancy spaces to house prisoners that are inadequate in living space, lack privacy, are unsanitary, are excessively noisy, cause increased incidents of violence without adequate security being provided and the denial of adequate access to the services such as phones, computers, etc. due to these overcrowded conditions is inconsistent with the evolving standards of our modern society and deprives the prisoners of the minimum necessities of a civilized life and is an arbitrary and capricious exercise of the BOP's statutory authority in violation of the Administrative Act, 5 U.S.C. § 701 et seq.;
and is likewise a violation of the Cruel and Unusual Clause of the Eighth Amendment to the United States Constitution.

### CLAIM II

49. The policy and practice by defendants of using race, ethnic, geographic or gang affiliation as the criteria and basis for housing assignments of prisoners is an arbitrary and capricious exercise of the BOP's statutory authority in violation of the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; 28 CFR § 551.90.
and in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

(15)

## RELIEF REQUESTED

A) That BOP Director Samuels direct that defendant Chief Physician Allen approve the treatment of Plaintiff with the drug Harvoni; and should the BOP not have the funds for the treatment, that Plaintiff be allowed to participate in the Patient Assistance Program of defendant Gilead Sciences.

B) That defendant President Obama through defendant Attorney General Lynch direct that defendant BOP Director Samuels cease the the use of multiple-occupancy spaces inadequate in space requirement to house the number of prisoners assigned to those spaces; and to cease the policy and practice of using the criteria of race, ethnic, geographic or gang affiliation as the basis of assigning housing to prisoners.

C) That compensatory and punitive damages be assessed against defendant Allen for the denial of medical treatment, for $50,000.

D) That compensatory and punitive damages be assessed against defendants Obama, Samuels, Dunbar, and Gross for the inadequate housing conditions visited upon the Plaintiff in the amount of $100,000.

Pursuant to 28 U.S.C. § 1746, under of penalty of perjury, Plaintiff jean Bernier declares that the forgoing Complaint is true and correct to the best of his knowledge.

Dated: 04/12/16

Respectfully Submitted,

Jean Bernier
29463-054
FCI Allenwood
P.O. Box 2000
White Deer, Pa. 17887

(16)

## ATTACHMENT A

### DEFENDANT ADDRESSES

President Barack Hussein Obama
The White House
1600 Pennsylvania Avenue
Washington, D.C. 20500


Attorney General Lynch
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530


Director Samuels
Federal Bureau of Prisons
320 First Street, N.W.
Washington, D.C. 20534


Gilead Sciences Inc.
333 Lakeside Drive
Foster City, California 94404

Asst. Director Dunbar
Federal Bureau of Prisons
320 First Street, N.W.
Washington, D.C. 20534

Asst. Director Gross
Federal Bureau of prisons
320 First Street, N.W.
Washington, D.C. 20534

BOP Chief Physician Allen
Federal Bureau of Prisons
320 First Street, N.W.
Washington, D.C. 20534