UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Jean-Gabriel Bernier,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil No. 16-cv-00828 (APM) |
| **Barack H. Obama,** *et al.*, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Plaintiff Jean-Gabriel Bernier's motion "for a preliminary injunction directing [ ] [D]efendant BOP Chief Physician Jeff Allen to provide Plaintiff with the drug treatment regimen of Harvoni; [and directing] [D]efendant BOP Director Samuels to house Plaintiff in a two-man cell." Notice of Motion, ECF No. 9.[1] For the reasons discussed below, the motion is denied.

**I.   BACKGROUND**

    **A.   First Cause of Action: Treatment for Hepatitis C**

        *1.   Plaintiff's Factual Allegations*

Plaintiff "suffers from Hepatitis C," which he describes as "a virus transmitted primarily through the blood . . . which impairs the liver," and "ultimately leads to cirrhosis" of the liver. Compl., ECF No. 1, ¶ 10. He believes that, if he were to "eradicate the virus now, the liver damage already done . . . will most likely be reversed and the painful symptoms which [he] suffers as a

---

[1] Plaintiff also has named as a defendant Gilead Sciences, Inc., the maker of Harvoni. Compl., ECF No. 1, ¶ 8. Because Plaintiff's motion for injunctive relief is not directed at Gilead Sciences, the court need not consider its opposition filing. *See* Gilead Science's Opp'n, ECF No. 15.

result of the present liver damage will cease to exist." *Id*. ¶ 24. These symptoms include "nausea, gastric dysfunction, chronic fatigue, night sweats and insomnia." *Id*.

Plaintiff alleges that, in October 2014, the Food and Drug Administration granted Gilead Sciences, Inc., "approval to market a drug named Harvoni for the cure of Hepatitis C." *Id*. ¶ 16. The drug is costly, however. Plaintiff represents that "a once a day pill cost[s] about $1,000.00 each amounting to $94,000.00 for a twelve-week treatment." *Id*. According to Plaintiff, patients who, like him, are "African-American, Genotype 1 (most difficult to treat), prior null responder to previous treatment regimens," experience "amazing results" on Harvoni. *Id*. ¶ 17.

When Plaintiff returned to federal custody in June 2015, he was designated to FCI Allenwood, a medium security institution. *See id*. ¶¶ 18, 29.[2] Based on "test results which indicated cirrhosis from 2012, 2014 and 2015" and "liver biopsy results from 2009 which showed Grade II, Stage II liver conditions," he "requested treatment with Harvoni." *Id*. ¶ 18.[3] Medical staff at FCI Allenwood, in turn, submitted a "request for treatment approval . . . to [D]efendant BOP Chief Physician Allen." *Id*. Dr. Allen denied the request on the ground that "Plaintiff did not meet the BOP priority criteria" based on certain, but not all, of the test results Plaintiff submitted. *Id*. ¶ 19.

On the belief that the high cost of Harvoni was the basis of Dr. Allen's decision, Plaintiff asked for permission "to participate in the Gilead Patient Assistance Program which is offered by Gilead for those unable to afford . . . the treatment." *Id*. ¶ 25. According to Plaintiff, BOP and

---

[2] "Plaintiff has been in prison since June 26, 1990, when he was arrested by New York [S]tate authorities on robbery charges." Compl. ¶ 28. Subsequently "Plaintiff was arrested by federal authorities on a set of different bank robbery charges and ultimately sentenced to 35 years imprisonment by a federal court." *Id*. In addition, he "was . . . sentenced to 25 years imprisonment by the state court." *Id*. He began to serve his federal sentence in 1992, was returned to New York State custody in 2003, and then two years later, in June 2015 "was returned to federal custody and designated to serve the rest of the federal sentence at FCI Allenwood." *Id*. ¶ 29.
[3] According to Plaintiff, Grade 2 means moderate inflammation of the liver, and Stage 2 means moderate fibrosis (scarring) of the liver. *See* Compl. ¶ 12.

2

Gilead officials conferred and "decided that prisoners would not be allowed to participate in the assistance program." *Id*. ¶ 26.  Nor has the BOP obtained other FDA-approved drugs for the treatment of Hepatitis C that recently have become available at a lower cost than Harvoni. *Id*. ¶ 27.

        2.     *Defendants' Representations*

Elizabete Stahl, D.O. ("Dr. Stahl"), a licensed physician employed as the Clinical Director at FCI Allenwood, examined Plaintiff on August 24, 2015, shortly after his arrival at the facility. Fed. Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 20, Ex. A, Decl. of Elizabete Stahl, D.O., ECF No. 20-1 [hereinafter Stahl Decl.], ¶¶ 1, 3-4.  According to Plaintiff's medical records, he had been diagnosed with Hepatitis C; an ultrasound of his liver had been done on January 1, 2013; and liver biopsies had been done in 2004 and 2009, the latter of which rated his condition as Grade 2, Stage IIB.  Stahl Decl. ¶ 4.  Plaintiff's APRI (AST/Platelet Ratio Index) score—a numerical method of measuring the risks associated with Hepatitis C—was a 0.47, and his genotype was 1a. *Id*.  Although Plaintiff displayed no clinical symptoms of cirrhosis at that time, Dr. Stahl ordered an updated ultrasound, *id*., which was administered on September 28, 2015, *id*. ¶ 5.  Plaintiff also underwent an upper endoscopy on November 18, 2015. *Id*.  Plaintiff "was seen by [Dr. Stahl's] staff on September 29, 2015, and again on October 29, 2015, related to his Hepatitis C condition." *Id*. ¶ 6.  In addition, on November 2, 2015, a registered nurse discussed with Plaintiff "the Hepatitis C Clinical Practice Guidelines and algorithm and what lab data staff look at in determining treatment priority levels." *Id*.

According to Dr. Stahl, "[t]he BOP has established priority criteria to ensure that those [patients] with the greatest need are identified and treated first." *Id*. ¶ 7.  Priority 1 patients, including those with documented cirrhosis and an APRI score greater than two, are the highest

3

priority. Priority 4 patients are the lowest priority. *See id*. Under this framework, Plaintiff is a Priority 3 patient. *Id*. This group includes "patients with Stage 2 fibrosis on liver biopsy [and an] APRI score [of] 1.5 to <2[.]" *Id*.

At six-month intervals, "the institution's infectious disease nurse runs a roster of all patients with a current/active diagnosis of Hepatitis C, and new APRI scores are calculated on every Hepatitis C patient[ ] and submitted to the clinical director/designee for review and prioritization." *Id*. ¶ 8. Only "[p]atients with APRI scores >2 are scheduled to meet with a medical provider and go over their interest/willingness to submit to treatment." *Id*. Plaintiff's APRI score as of July 14, 2016, was 0.32. *Id*.

"On December 22, 2015, a request for Harvoni anti-viral treatment for Hepatitis C was submitted," presumably by Plaintiff. *Id*. ¶ 9. At that time, Plaintiff had an APRI score of 0.40. *Id*. The request was denied because, absent evidence of advanced liver disease, Plaintiff did not meet BOP's priority treatment criteria. *Id*. As a Priority 3 patient, Dr. Stahl stated, Plaintiff continues to be "monitored according to BOP Clinical Guidelines." *Id*.

    **B.**    **Second Cause of Action: Six-Man Cells**

        *1.*    *Plaintiff's Allegations*

Plaintiff is housed in a six-man cell, which was created when "two two-man cells [ ] were converted into one space to house six men." Compl. ¶ 30. These close conditions "create[] an environment of excess noise and chaos," *id*. ¶ 35, and cause "tension and animosity" among the prisoners, *id*. ¶ 35, whose "standards of cleanliness," *id*. ¶ 36, and sleep schedules, *id*. ¶ 37, for example, may differ. Plaintiff alleges that "confine[ment] with five other men" leaves him "no personal space for privacy to conduct . . . personal functions," *id*. ¶ 33, and the crowded housing unit "deprives [him] of the opportunity to find some peace of mind," *id*. ¶ 35. These conditions

have been exacerbated by the addition of 30 men to the housing unit. *Id.* Plaintiff also complains of inadequate ventilation which "renders the cell stifling in the summer and freezing cold in the winter time." *Id.* ¶ 34. Further, Plaintiff alleges, he has remained in a six-man cell for almost a year, *see id.* ¶ 38 (alleging that Plaintiff was assigned to a six-man cell upon his arrival at FCI Allenwood), while other prisoners were "assigned to a two-man cell" within days of their arrival at FCI Allenwood, *id.* ¶ 39. According to Plaintiff, the "prisoners dictate[ ] the cell assignments," and staff acquiesce to the prisoners' choices, all of which are "made on the basis of racial, ethnic, geographical or gang affiliation," *id.* ¶ 40, because this arrangement supposedly "avoided conflicts" among the prisoners, *id.* ¶ 41.

2.     *Defendants' Representations*

Defendants have submitted an affidavit from James Hill, Plaintiff's correctional counselor. Defs.' Opp'n, Ex. B, Decl. of James Hill, ECF No. 20-1 [hereinafter Hill Decl.], ¶ 4. Plaintiff is currently housed in Housing Unit 1A at FCI Allenwood. *Id.* Mr. Hill is "responsible for the housing assignments" in that unit. *Id.* He describes six-man cells as "either a television room . . . converted to a six-man cell or . . . two cells modified to create one large cell . . . by removing the wall which had separat[ed] two cells" and putting in that space a bunk bed. *Id.* ¶ 5. According to Mr. Hill, these six-man cells meet American Correctional Association standards. *Id.*

Mr. Hill maintains an unofficial list of inmates awaiting reassignment to two-man cells. *Id.* ¶ 7. He updates the list periodically as inmates move out of six-man cells into two-man cells. *Id.* According to Mr. Hill, "[o]n October 13, 2015, there were 30 inmates on the . . . list, and [Plaintiff] was number 14[.]" *Id.* When Mr. Hill last updated his list on April 7, 2016, Plaintiff

was number 1 on a list of 29 inmates. *Id*. Plaintiff's cell assignment is complicated somewhat by his need for a bottom bunk. *Id*.

Although Plaintiff blames Defendants for his prolonged stay in a six-man cell, Mr. Hill avers that he has "offered [Plaintiff] placement in a two-man cell on numerous occasions, and [Plaintiff] has declined . . . each time." *Id*. ¶ 6. He explains that Plaintiff "is very particular with his cellmate selection and does not want to move into a [cell] which already has another inmate assigned to it." *Id*. Rather, Plaintiff "only wants to move into an empty two-man cell in hopes that he will be able to select whom his cellmate will be." *Id*. Plaintiff dismisses Mr. Hill's assertions as "downright fabrication," and maintains that inmates, not Mr. Hill, determine cell assignments. Reply to Opp'n for Prelim. Inj., ECF No. 25, at 3.

**II.   DISCUSSION**

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). "[A] preliminary injunction is an extraordinary and drastic remedy . . . that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original) (citation omitted). In determining whether to grant a preliminary injunction this court "must balance four factors: (1) the movant's showing of a substantial likelihood of success on the merits, (2) irreparable harm to the movant, (3) substantial harm to the nonmovant, and (4) public interest." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009) (citation omitted).

In the District of Columbia Circuit, courts have "traditionally balanced these four factors on a 'sliding scale' whereby a movant's unusually strong showing on one factor could compensate for weaker showings on one or more other factors." *Pinson v. US Dep't of Justice*, No. CV 12-

1872, 2016 WL 1408079, at *2 (D.D.C. Apr. 8, 2016) (citations omitted). The sliding scale approach has been called into question, however, in light of the Supreme Court's ruling in *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008), which requires "some showing on each factor," *Singh v. Carter*, No. CV 16-399, 2016 WL 2626844, at *5 (D.D.C. May 6, 2016) (citing *Winter*, 555 U.S. at 23-24, 31-32).

In this case, the court need not consider any other factor other than the first: Plaintiff's likelihood of success. Plaintiff's motion is denied because he fails to demonstrate a substantial likelihood of success on the merits of his claims.

### A. Harvoni Treatment

According to Plaintiff, Defendants' refusal to provide adequate medical treatment for Hepatitis C "violat[es] . . . the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution." *Id.* ¶ 46. To state a claim for violation of the Eighth Amendment based on inadequate medical care, Plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To prevail, Plaintiff must show both that his medical needs were objectively serious, and that defendant possessed a sufficiently culpable state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991). The court assumes for present purposes that Plaintiff has shown that he has serious medical needs. His motion nevertheless fails because he has not demonstrated that Defendants have been deliberately indifferent to those medical needs.

Instead, at most, it appears that the parties disagree on a proper course of treatment for Plaintiff's condition. Prison officials are not, however, "deliberately indifferent to an inmate's serious medical need when [a] physician prescribes a different method of treatment than that requested by the inmate." *Harrell v. Cal. Forensic Med. Grp., Inc.*, No. 2:15-CV-0579, 2015 WL

6706587, at *2 (E.D. Cal. Nov. 3, 2015) (citation omitted); *see Johnson v. Frakes*, No. 8:16CV155, 2016 WL 4148231, at *3 (D. Neb. Aug. 4, 2016) (concluding that "Defendants' failure to provide Plaintiff with Harvoni, his requested course of treatment, did not constitute an Eighth Amendment violation," in light of the warden's "responsive[ness] to Plaintiff's requests for treatment"); *Smith v. Corizon, Inc.*, No. 15-743, 2015 WL 9274915, at *6 (D. Md. Dec. 17, 2015) (finding that denial of an asymptomatic inmate's request for Harvoni treatment did not reflect deliberate indifference where inmate "was repeatedly seen by prison nurses, [physician's assistants] and physicians for his chronic conditions, including [Hepatitis C]").

      **B.**      **Housing in a Six-Man Cell**

The court reaches the same conclusion as to his second claim: Plaintiff has failed to demonstrate a likelihood of success on the merits. Plaintiff alleges that the conditions of his confinement, particularly his placement in a six-man cell, violate the Eighth Amendment. That Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain . . . or are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citations omitted). A prison need not be comfortable, *see id.* at 349, but it cannot not "deprive inmates of the minimal civilized measure of life's necessities," *id.* at 347. *See also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("The [Eighth] Amendment . . . requires that inmates be furnished with the basic human needs.").

The conditions Plaintiff describes may be restrictive, uncomfortable, and otherwise bothersome, but they do not amount to "barbarous" punishment which contravenes our society's "evolving standards of decency." *Rhodes*, 452 U.S. at 346. Thus, Plaintiff does not demonstrate a substantial likelihood of success on the merits of his claim that the conditions of his confinement in a six-man cell at FCI Allenwood violate the Eighth Amendment. *See, e.g., Muñiz v.*

*Richardson*, 371 F. App'x 905, 908 (10th Cir. 2010) (finding that allegations "about living conditions center[ing] on excessive heating and air conditioning, dirty mops, insufficiently sized showers, and television programs played continuously in a loop" do not state Eighth Amendment violations); *Lawrence v. Fairman*, No. 93 C 4325, 1994 WL 529402, at *2 (N.D. Ill. Sept. 27, 1994) ("Mere overcrowding and lack of a sleeping space or mattress are not the type of substantial risk of harm, the disregard of which, will support an Eighth Amendment claim."); *Warren v. Stempson*, 800 F. Supp. 991, 992-93 (D.D.C. 1992) (finding that the plaintiff's allegations of vermin infestation and cold water for showers, while substandard, did not rise to the level of cruel and unusual punishment), *aff'd*, 995 F.2d 306 (D.C. Cir. 1993) (per curiam).

### III. CONCLUSION

Accordingly, it is hereby ordered that Plaintiff's Motion for a Preliminary Injunction, including his requests for expedited discovery and for appointment of an expert, is denied.

Date: August 24, 2016

Amit P. Mehta
United States District Judge