UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JEAN-GABRIEL BERNIER, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Case No. 16-cv-00828 (APM) |
| DONALD J. TRUMP, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jean-Gabriel Bernier brings this suit challenging two aspects of his confinement. First, he contests the Federal Bureau of Prison's refusal to prescribe him with the drug Harvoni to treat his Hepatitis C, and Defendant Gilead Sciences, Inc.'s decision not to accept him into a patient assistance program designed for those who are unable to afford Harvoni. Second, Plaintiff complains about the conditions in which he is housed, specifically, that he is housed in a six-man cell and that cell assignments at the prison are made on the basis of race and ethnic origin.

This matter is before the court on the Federal Defendants' Motion to Dismiss and Defendant Gilead Sciences, Inc.'s Motion to Dismiss.[1] For the reasons discussed below, the Federal Defendants' motion is granted in part and denied in part. Plaintiff will be permitted to proceed against the Federal Defendants on his claim that the denial of Harvoni violates his Eighth

---

[1] Defendant did not name the Federal Bureau of Prisoners as a defendant, but instead named as defendants Barack H. Obama, former President of the United States; Loretta E. Lynch, former Attorney General of the United States; Charles E. Samuels, former Director of the Federal Bureau of Prisons; Angela P. Dunbar, Assistant Director of Correctional Programs at the Federal Bureau of Prisons; Bradley T. Gross, Assistant Director of Administration at the Federal Bureau of Prisons; and Jeff Allen, Chief Physician at the Federal Bureau of Prisons. Pursuant to Federal Rule of Civil Procedure 25(d), President Donald J. Trump is substituted for President Barack H. Obama; Attorney General Jeff B. Sessions is substituted for Loretta E. Lynch; and Acting Director of the Federal Bureau of Prisons Thomas R. Kane is substituted for Charles E. Samuels. The court refers to the individual defendants collectively as "the Federal Defendants."

Amendment right against cruel and unusual punishment, but on no other claim. Defendant Gilead Sciences, Inc.'s Motion is granted in its entirety.

## I. BACKGROUND

Plaintiff is a prisoner in the custody of the Federal Bureau of Prisons ("BOP"), designated to a medium security facility in White Deer, Pennsylvania ("FCI Allenwood"), who suffers from Hepatitis C. *See* Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 10, 18, 29. He has filed suit in response to the BOP's refusal to provide him with Harvoni, a medication that treats Hepatitis C, or allow him to participate in an assistance program for those unable to afford Harvoni. *Id.* ¶¶ 19, 25, 45–47. Plaintiff simultaneously seeks relief from the BOP's decision to house him in a unit known as a "six man cell," in which six inmates live in cell blocks designed to hold four inmates. *Id.* ¶¶ 30–31, 40–41, 48–49. The court addresses each cause of action in turn.

### A. Plaintiff's Treatment for Hepatitis C

Plaintiff describes Hepatitis C as "a virus transmitted primarily through the blood and which impairs the liver," "ultimately lead[ing] to cirrhosis, end-stage liver disease, liver cancer, . . . liver failure and death." *Id*. ¶ 10. He "presently suffers from nausea, gastric dysfunction, chronic fatigue, night sweats and insomnia." *Id*. ¶ 24. Generally, Plaintiff explains, treatment for patients diagnosed with "chronic Hep[atitis] C . . . is to[] monitor the functioning of the liver and the progression of the disease and damage to the liver." *Id*. ¶ 12. Damage to the liver "is quantified based on Grade and Stage." *Id*.

When Plaintiff was returned to federal custody in June 2015, he "submitted to his medical providers . . . at FCI Allenwood Fibrosure test results which indicated cirrhosis [of his liver] from 2012, 2014 and 2015." *See id*. ¶ 18. In addition, he submitted "liver biopsy results from 2009 which showed Grade II, Stage II liver conditions." *Id*. He then "requested treatment with

Harvoni," a drug manufactured by Defendant Gilead Sciences, Inc. ("Gilead"), a publicly held corporation that sells the drug to the BOP "at deeply discounted prices through the Federal Supply Schedule contract." *Id.* ¶¶ 8, 18; Def. Gilead Sciences, Inc.'s Mot. to Dismiss & Mem. in Supp., ECF No. 12 [hereinafter Def. Gilead's Mot.], at 2.[2]  According to Plaintiff, patients like himself— "African-American, Genotype 1 (most difficult to treat), prior null responder to previous treatment regimens"—have experienced "amazing results" on Harvoni. Compl. ¶ 17. Plaintiff submitted his request for treatment to Defendant Dr. Jeff Allen, Chief Physician at the BOP, for approval. *Id.* ¶ 18. Dr. Allen denied Plaintiff's request on the ground that "Plaintiff did not meet the BOP priority criteria" based on certain of the test results Plaintiff had submitted. *Id.* ¶ 19.

Plaintiff alleges that the BOP's policy allows for reliance on indications of cirrhosis beyond those shown in APRI scores—in accord with the medical profession's standard of care—but, in practice, the BOP is not considering clear indicators of cirrhosis and wrongly denying prisoners with Hepatitis C, such as himself, treatment. The medical profession uses various tests to diagnose cirrhosis and disease progression, including liver biopsies, ultrasound scans, APRI scores, and FibroSure scores.[3]  *See id.* ¶¶ 13, 15; Hepatitis C Online, *Evaluation & Staging of Liver Fibrosis*, UNIV. OF WASH., http://www.hepatitisc.uw.edu/go/evaluation-staging-monitoring/evaluation-staging/core-concept/all. Plaintiff contends that Dr. Allen erroneously relied on Plaintiff's low APRI number and outdated biopsy results, rather than Plaintiff's more recent FibroSure scores, despite BOP policy stating "that the APRI should not be used if there is some other indication of

---

[2] Pin citations to Gilead's motion reference the original pagination of the Memorandum of Points and Authorities in Support, which begins on the third page of the document.

[3] APRI is an acronym for "Aminotransferase Aspartate to Platelet Ratio Index," which is test whose numerical score is used to detect cirrhosis. Aminotransferase Aspartate, or AST, is a type of enzyme found in, among other places, the liver. *See* Hepatitis C Online, *AST to Platelet Ratio Index (APRI) Calculator*, UNIV. OF WASH., http://www.hepatitisc.uw.edu/page/clinical-calculators/apri.  HCV FibroSure is "a noninvasive blood test of 6 biochemical markers" that may be used to "assess[] liver status following a diagnosis of HCV" (Hepatitis C). *See Hepatitis C Virus (HCV) FibroSure*, LABORATORY CORPORATION OF AMERICA (2017), https://www.labcorp.com/tests/related-documents/L9465.

cirrhosis." *See* Compl. ¶¶ 15, 18–19. Moreover, Plaintiff contends, the "BOP's reliance on the APRI as the gateway for consideration for treatment goes against the medical evidence," because APRI scores accurately reflect disease progression in only "75% of cases measured for cirrhosis." *Id.* ¶¶ 14, 21. "There are Hep[atitis] C patients like the Plaintiff who do not have high AST numbers[, which are primarily used to calculate APRI scores,] but who nevertheless suffer from high inflammation of the liver and fibrotic damage as indicated by the results of the Fibrosure test done on Plaintiff." *Id.* ¶ 22. Accordingly, had Dr. Allen properly considered Plaintiff's FibroSure score, as the BOP policy and medical community require, then, Plaintiff believes, he would have realized that Plaintiff suffers an advanced stage of liver disease that warrants treatment with Harvoni. *Id.*

Plaintiff foresees dire consequences flowing from the BOP's decision not to treat him with Harvoni. Failure to treat Plaintiff is "allow[ing] continuing damage to be visited upon [his] liver to the point of the damage being irreversible. At that point, treatment will not ameliorate the liver condition and will lead to the need for a transplant or liver cancer." *Id.* ¶ 23. "Should the Plaintiff eradicate the virus now [through treatment with Harvoni], the liver damage already done to the liver will most likely be reversed and the painful symptoms which the Plaintiff suffers as a result of the present liver damage will cease to exist." *Id.* ¶ 24.

Harvoni is expensive, however. The daily dose for one patient costs approximately $1,000.00 and the treatment is twelve weeks long, leading to a price tag of $94,000.00. *Id*. ¶ 16. Plaintiff contends that Dr. Allen based his decision to deny him access to Harvoni not on a valid medical reason, but instead to "avoid[] the costs of the Harvoni treatment." *Id*. ¶ 25.

Plaintiff also alleges that he was erroneously denied participation in a program designed for those unable to afford the cost of Harvoni. On the belief that cost alone is the driving

4

consideration behind the BOP's decision to deny Plaintiff access to Harvoni, Plaintiff sought permission from both BOP and Gilead "to participate in the Gilead Patient Assistance Program[,] which is offered by Gilead for those unable to afford . . . the [Harvoni] treatment." *Id.* According to Plaintiff, BOP and Gilead officials conferred and "decided that prisoners would not be allowed to participate in the assistance program." *Id.* ¶ 26.  The BOP has not only refused to provide Plaintiff access to Harvoni, but also failed to obtain any other recently approved drugs for the treatment of Hepatitis C, even though these drugs are less costly than Harvoni. *Id.* ¶ 27.

Plaintiff claims that the BOP's denial of treatment with Harvoni violates his Eighth Amendment protection against cruel and unusual punishment. *Id.* ¶¶ 45–46.  He also contends that the denial violates the Equal Protection Clause of the Fifth Amendment, because the denial was "based on race, age and status as a prisoner." *Id.* ¶ 47.   Additionally, Plaintiff claims that Gilead's refusal to allow him to participate in the Harvoni patient assistance program violates the Patient Protection and Affordable Care Act ("ACA"), *see* 42 U.S.C. § 18116.  Compl. ¶ 47.

### B.   Plaintiff's Housing Conditions

Plaintiff was housed at FCI Allenwood in a "six-man cell"—which is formed by combining two cells intended to house two men each into a single space into which six men are placed—in a housing unit occupied by 30 excess prisoners. *See id.* ¶¶ 30, 35.  According to Plaintiff, these close conditions "create[d] an environment of excess noise and chaos" and caused "tension and animosity" amongst the prisoners, whose "standards of cleanliness" and sleep schedules differ. *Id.* ¶¶ 35–37.  Plaintiff alleges that living in the six-man cell left him "no personal space for privacy to conduct [his] personal functions," and the cell "deprive[d him] of the opportunity to find some peace of mind." *Id.* ¶¶ 33, 35.  He also complains that his cell had inadequate ventilation, which "render[ed] the cell stifling in the summer and freezing cold in the winter time." *Id.* ¶ 34.  Further,

5

Plaintiff's Complaint states, Plaintiff remained in a six-man cell for several weeks, while other prisoners "would be assigned to a two-man cell" within days of their arrival at FCI Allenwood. *Id*. ¶¶ 38, 39.

According to Plaintiff, the BOP makes its housing assignments based on prisoners' races, ethnicities, and geographic or gang affiliations. *Id*. ¶ 40. Plaintiff alleges that FCI Allenwood staff, as well as former BOP Director Charles Samuels and Assistant Directors Angela P. Dunbar and Bradley T. Gross, "condoned the manner of basing housing assignments on those [aforementioned] criteria" in order to "avoid[] conflicts" amongst prisoners. *Id*. ¶ 41. He asserts that "whites are housed with whites in the two-man cells, hispanics with hispanics and blacks with blacks," and "blacks . . . spend the most time in the six-man cells [because] . . . the hispanics and whites 'control' more cells." *Id*. ¶ 44.

The BOP's records reflect that Plaintiff was given a space in a two-man cell when one became available, and he is no longer housed in a six-man cell. Plaintiff was "at the top of the waiting list for a two-man cell," and when one became available on September 6, 2016, it was offered to Plaintiff. Fed Defs.' Reply to Pl.'s Opp'n, ECF No. 36, Ex. C, ECF No. 36-1, ¶ 4. Plaintiff was removed from FCI Allenwood on a federal writ on October 3, 2016, but he returned on October 31, 2016, and moved into the two-man cell. *Id.* ¶¶ 3–4.

Plaintiff claims that his assignment to a six-man cell constitutes cruel and unusual punishment in violation of the Eighth Amendment. Compl. ¶ 48. In addition, he asserts that "[t]he policy and practice . . . of using race, ethnic, geographic or gang affiliation as the criteria . . . for housing assignments . . . is an arbitrary and capricious exercise of the BOP's statutory authority" that violates his rights under the Fifth Amendment. *Id*. ¶ 49.

As to both sets of claims—those premised on the denial of Harvoni and those premised on housing practices—he demands injunctive relief and compensatory and punitive damages. Specifically, he requests that $50,000 be assessed against Dr. Allen for denying him Harvoni, and that $100,000 be assessed against Obama, Samuels, Dunbar, and Gross for his inadequate housing conditions. *See id*. 16.

### C. Plaintiff's Motion for a Preliminary Injunction

In June 2016, Plaintiff filed a motion for a preliminary injunction, seeking treatment with Harvoni and housing in a two-man cell, on the ground that denying him such treatment and housing violated the Eighth Amendment. Pl.'s Mot. for a Prelim. Inj., ECF No. 9, at 1. The court denied the motion, concluding that, based on the record then before the court, Plaintiff failed to demonstrate a likelihood of success on the merits of his claims. *See Bernier v. Obama*, 201 F. Supp. 3d 87, 92–94 (D.D.C. 2016), *appeal docketed*, No. 16-5281 (D.C. Cir. Sept. 30, 2016).

As to the Harvoni-based claim, the court concluded that Plaintiff had not demonstrated that any Defendant had been deliberately indifferent to his medical needs. In reaching that conclusion, the court relied, in part, on the representations of Elizabete Stahl, the Clinical Director at FCI Allenwood, who stated that Plaintiff did not meet the BOP's criteria to receive Harvoni at the time he requested it, though he might meet those criteria in the future. *See* Fed. Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 20 [hereinafter Fed. Defs.' Opp'n to Prelim. Inj.], Ex. A, ECF No. 20-1 [hereinafter First Stahl Decl.], ¶¶ 7–9. Accordingly, "at most," the court concluded, "it appear[ed] that the parties disagree on a proper course of treatment for Plaintiff's condition," and Defendants are not "deliberately indifferent to an inmate's serious medical need when [a] physician prescribes a different method of treatment than that requested by the inmate." *Bernier*, 201 F. Supp. 3d at 93 (internal quotation marks omitted).

The court also denied Plaintiff's motion with respect to his claim that his conditions of confinement in the six-man cell violated the Eighth Amendment. The court held that, although the conditions Plaintiff describes in his Complaint "may be restrictive, uncomfortable, and otherwise bothersome, . . . they do not amount to 'barbarous' punishment which contravenes our society's 'evolving standards of decency,'" and, thus, do not constitute cruel and unusual punishment. *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).

Accordingly, the court denied Plaintiff's Motion for a Preliminary Injunction.

## II. DISCUSSION

Now before the court are the Federal Defendants' and Gilead's Motions to Dismiss. *See* Fed. Defs.' Mot. to Dismiss & Mem. in Supp., ECF No. 28 [hereinafter Fed. Defs.' Mot.], at 2;[4] Def. Gilead's Mot. at 2. The court first addresses Plaintiff's claims against the Federal Defendants, and then turns to his claims against Gilead.

### A. The Federal Defendants' Motion to Dismiss[5]

#### 1. *Qualified Immunity*

The court begins with Plaintiff's *Bivens*[6] claims, that is, his claims for money damages against each Federal Defendant in his or her individual capacity for alleged constitutional violations. Those claims fall into two categories.

The first category of claims relates to the BOP's decision to deny Plaintiff Harvoni to treat his hepatitis. As to that category, Plaintiff claims that the Federal Defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment by "deny[ing] Plaintiff

---

[4] Pin citations to this source reference the original pagination of the respective Memorandum of Points and Authorities in Support, which begins on the third page of the document.
[5] The court does not read Plaintiff's Complaint to advance a claim for money damages against the United States, and Plaintiff himself makes clear that he does not bring such a claim. *See* Pl.'s Opp'n to Fed. Defs.' Mot. to Dismiss, ECF No. 43, at 2. The court, therefore, need not address the Federal Defendants' contention that the United States has not waived its sovereign immunity with respect to a suit seeking money damages for a constitutional tort.
[6] *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

treatment for Hepatitis C pursuant to the BOP treatment guidelines and allowing [him] to suffer from the debilitating effects of [Hepatitis C]." Compl. ¶¶ 45–46. He also contends that the Federal Defendants violated his Fifth Amendment right to equal protection by denying him access to Gilead's patient assistance programs based on his "race, age, and status as a prisoner." *Id*. ¶ 47.

The second category of claims relates to Plaintiff's housing conditions. As to that category, Plaintiff asserts that placing him in a six-man cell constituted cruel and unusual punishment in violation of the Eighth Amendment. *Id.* ¶ 48. Additionally, he maintains that the alleged practice of assigning cells based on race or ethnicity violated his rights under the Equal Protection Clause. *Id.* ¶¶ 48–49.

As to each of these claims, the Federal Defendants argue that they are entitled to qualified immunity and, on that ground, Plaintiff's *Bivens* claims must be dismissed. *See* Fed. Defs.' Mot. at 16. The court agrees. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court evaluates a defendant's claim of qualified immunity by determining (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts are vested with discretion to decide which of the two prongs to address first "in light of the circumstances in the particular case at hand." *See Pearson v. Callahan*, 555 U.S. 226, 236 (2009). To conclude that a right was "clearly established, the court must determine that " it would [have] be[en] clear to a reasonable [official] that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, based on "[c]ontrolling precedent from the Supreme Court, the

applicable state supreme court, or from the applicable circuit court," *Corrigan v. District of Columbia*, 841 F.3d 1022, 1041 (D.C. Cir. 2016), or "a *robust* consensus of cases of persuasive authority," *id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Here, Plaintiff's *Bivens* claims are easily dismissed on the second prong of the qualified immunity test because the rights Plaintiff claims were violated were not clearly established at the time the alleged violations occurred. Plaintiff has cited no binding case, and the court is aware of none, holding that denying a prisoner Harvoni to treat Hepatitis C based only on his APRI score violates the Eighth Amendment; denying a prisoner access to a patient assistance program based on his status as a prisoner violates the Fifth Amendment;[7] housing a prisoner in a six-man cell violates the Eighth Amendment; or selecting cell assignments based on race or ethnicity violates the Fifth Amendment. Accordingly, Plaintiff's *Bivens* claims are dismissed.[8]

2. *Failure to State a Claim*

Having disposed of Plaintiff's claims for money damages on qualified immunity grounds, the court turns next to his claims against the Federal Defendants in their official capacities for injunctive relief. The Federal Defendants maintain that Plaintiff has failed to state a claim and seek dismissal under Federal Rule of Civil Procedure 12(b)(6).[9]

---

[7] The court does not address whether denying Plaintiff access to a patient assistance program based on his race and age violated a "clearly established" right because, as explained below, Plaintiff has failed to allege Fifth Amendment violations based on those classifications.

[8] Because the court dismisses Plaintiff's *Bivens* claims on qualified immunity grounds, the court need not address Federal Defendants' arguments concerning lack of personal jurisdiction and insufficient service of process. *See* Fed. Defs.' Mot. at 9–11. For the same reason, the court does not reach their assertion that this is not the proper judicial district in which to hear Plaintiff's *Bivens* claims. *See id.* at 12–14.

[9] Plaintiff also asserts his claims under the Administrative Procedure Act ("APA"). Compl. ¶¶ 45–47. Because the APA authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), the court's analysis as to Plaintiff's constitutional claims for injunctive relief applies equally to his claims under the APA.

          a.        <u>Harvoni-based claims</u>

The court begins with Plaintiff's contention that the Federal Defendants violated the Eighth Amendment's protection against cruel and unusual punishment by refusing to treat him with Harvoni.

The Eight Amendment obligates the government to "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *accord Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Deliberate indifference may arise by a prison doctor's response to his or her patient's needs or a prison guard's intentional denial of, or delay or intentional interference with, a prisoner's medical care, either when that need arises or after treatment has been prescribed. *Id.* at 104–05 (footnotes omitted). Allegations that a defendant has subjected the plaintiff to "an unreasonable risk of serious damages to his future health," as well as his present health, are actionable under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (rejecting the proposition that prison authorities "may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year"). However, "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. Consequently, the plaintiff must plausibly alleged that the official was both "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official "dr[e]w the inference" in order to survive a motion to dismiss. *See id.* (explaining that the test for "deliberate indifference" is a subjective one).

The Supreme Court has warned against too hurried a dismissal of a pro se prisoner's complaint regarding deliberate indifference to his medical needs. In *Erickson v. Pardus*, the Court wrote specifically in the context of a prisoner with Hepatitis C seeking medication, whose Eighth Amendment claim had been rejected by the lower courts. 551 U.S. 89, 90–93 (2007) (per curiam). The Court emphasized that, in evaluating such claims, courts must apply the liberal pleading standard of Rule 8(a)(2), which only requires the plaintiff to plead such facts as are necessary to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 93 (alteration in original) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court also stressed that courts must "liberally construe[]" a pro se litigant's complaint. *Id.* at 94 (quoting *Estelle*, 429 U.S. at 106). Applying those principles, the Court held that the prisoner in that case properly had alleged an Eighth Amendment violation where he claimed that his medication had been withheld prior to his completion of the treatment program; he was still in need of treatment; and the prison officials were refusing to provide treatment. *Id.*

*Erickson* compels the conclusion here that Plaintiff adequately has stated a claim under the Eighth Amendment because the BOP has denied him access to Harvoni to treat his Hepatitis C. Plaintiff alleges that his inability to have Harvoni "allows continuing damage to be visited upon [his] liver to the point of the damage being irreversible. At that point, treatment will not ameliorate the liver condition and will either lead to the need for a transplant or liver cancer." Compl. ¶ 23. That allegation easily establishes a "serious medical need." *See Erickson*, 551 U.S. at 94 (allegation that removal of hepatitis C medication was "endangering [the plaintiff's] life" was sufficient to establish serious medical need); *Merriweather v. Lappin*, No. 10-5184, 2011 WL 5515552, at *1 (D.C. Cir. Oct. 19, 2011) (per curiam) (mem.) (reversing grant of motion to dismiss complaint filed by hepatitis C prisoner-patient who alleged violation of Eighth Amendment for

denial of medical care); *cf. Ibrahim v. District of Columbia*, 463 F.3d 3, 6–7 (D.C. Cir. 2006) (holding that "failure to provide adequate treatment for Hepatitis C, a chronic and potentially fatal disease, constitutes 'imminent danger'" under the Prison Litigation Reform Act).

Furthermore, Plaintiff has sufficiently pled that the Federal Defendants exhibited deliberate indifference to his need for treatment with Harvoni. Plaintiff alleges that the BOP has violated its own policies and the standard of care in the medical profession by ignoring test results—his FibroSure scores from 2012, 2014, and 2015—indicating he has cirrhosis that requires treatment with Harvoni. Compl. ¶¶ 13, 15, 18–19. The BOP's exclusive reliance on APRI scores and old biopsy results to deny him Harvoni, he further contends, is not premised on valid medical criteria, but instead driven by "avoiding the costs of the Harvoni treatment by denying mostly all prisoners who presently suffer from Hep[atitis] C." *Id.* ¶ 25. Plaintiff posits that if he were to receive Harvoni now, then "the liver damage already done to the liver will most likely be reversed and the painful systems which he Plaintiff suffers as a result of the present liver damage will cease to exist." *Id.* ¶ 24. The foregoing allegations are more than adequate to put the Federal Defendants on notice of Plaintiff's Eighth Amendment claim, which is all that Rule 8(a) requires. *See* Fed. R. Civ. P. 8(a); *Erickson*, 551 U.S. at 94.

The Federal Defendants contend that the court must dismiss Plaintiff's Eighth Amendment claim for the same reasons the court determined Plaintiff had not demonstrated a substantial likelihood of success when he sought preliminary injunctive relief. Fed. Defs.' Mot. at 16–17. That argument, however, fails to recognize the more stringent standard applicable to motions for preliminary relief relative to motions to dismiss under Rule 12(b)(6), as well as the procedural posture in which that request arose in this case. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Consonant with the granting of such extraordinary relief, a plaintiff must demonstrate a "likelihood of success on the merits," typically at an early stage in the case. *Id.* at 32. By contrast, a plaintiff need not make such a heightened showing to defeat a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556. The standards, then, are substantially different: the first requires the plaintiff to establish a likelihood of proving the truth of his allegations, while the second assumes the truth of the allegations and asks simply that those allegations allow a reasonable inference of defendant's liability. *Compare Winter*, 555 U.S. at 32, *with Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In this case, the court's denial of injunctive relief was based on a limited record, before Plaintiff was afforded any opportunity for discovery and without the benefit of counsel. Those are not the circumstances under which the court reviews the Federal Defendants' Rule 12(b)(6) motion. Instead, at this stage in the litigation, the court is asked only whether Plaintiff's Complaint contains sufficient factual allegations that, if true, would state a claim to relief. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. Looking at the Complaint, the court cannot conclude that Plaintiff's Eighth Amendment claim for denial of medical treatment is so conclusory or bare-boned to warrant dismissal. With the benefit of discovery and counsel, it is plausible that Plaintiff could obtain relief. *Cf. Abu-Jamal v. Wetzel*, No. 16-2000, 2017 WL 34700 (M.D. Penn. Jan. 3, 2017).

Plaintiff's Fifth Amendment claim, by contrast, gives the court no such pause. Plaintiff offers not a single factual allegation to support his contention that the Federal Defendants denied him Harvoni based on his "race, age, or status as a prisoner." At most, Plaintiff alleges—in very general terms—that "the prison population in the BOP is disproportionately black and thusly there

is a higher number of black prisoners suffering from this ailment." *Id.* ¶ 27a. This allegation, however, makes no connection to the BOP's provision or refusal to provide Harvoni or a place in the patient assistance program. *Cf.* Compl. ¶ 47. Moreover, Plaintiff's status as a prisoner is not a suspect classification that affords him Fifth Amendment protection beyond rational basis scrutiny. *See Kaemmerling v. Lappin*, 553 F.3d 669, 685 (D.C. Cir. 2008). Plaintiff's Complaint contains neither facts that would negate any rational basis for denying treatment in light of his status as a prisoner, *see Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012), nor any allegations of animus, *see, e.g.*, *Romer v. Evans*, 517 U.S. 620, 623 (1996). Accordingly, the courts dismisses Plaintiff's claim under the Fifth Amendment alleging that he was deprived Harvoni on account of his race, age, or status as a prisoner.

b. <u>Housing conditions-based claims</u>

The court concludes Plaintiff's Complaint falls short of stating a plausible claim for violations of his Fifth and Eighth Amendment rights arising from his placement in a six-man cell for several months. With regard to his assertion that housing six prisoners in a cell intended for four prisoners violates the Eighth Amendment, the court already has held that "the [six-man cell] conditions Plaintiff describes may be restrictive, uncomfortable, and otherwise bothersome, but they do not amount to 'barbarous' punishment which contravenes our society's 'evolving standards of decency.'" Accordingly, the court now dismisses Plaintiff's claim that his placement in the six-man-cell violated his Eighth Amendment right to be free from cruel and unusual punishment. *Bernier*, 201 F. Supp. 3d at 93 (quoting *Rhodes*, 452 U.S. at 346).

Likewise, Plaintiff's assertion—unsupported by any factual content—that prisoners are assigned cells based on race or ethnicity does not state a plausible violation of the Fifth Amendment. *See Rivera v. U.S. Dep't of Justice*, No. 12-0168, 2013 WL 1285145, at *8 (D.D.C.

Mar. 28, 2013) (rejecting prisoner's "bald assertion of race discrimination" claim because he had not alleged any specific basis that, "for example, defendants made cell assignments based on race in response to a specific threat of violence, or to further a compelling interest such as prison safety and security, race-based cell assignments may be permissible").

### B. Gilead's Motion to Dismiss

The court need not linger over the viability of Plaintiff's claims against Gilead under the APA and United States Constitution. Gilead is a private corporation, not an agency of the federal government, and, as such, it is not subject to suit under the APA. *See* 5 U.S.C. §§ 701(b)(1), 704 (defining "agency" as "each authority of the Government of the United States" and providing for judicial review of "final agency action"). Nor is Gilead the proper subject of a *Bivens* claim. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001). Plaintiff's contention that Gilead became a "state actor" when it agreed to supply drugs to the BOP, *see* Pl.'s Opp'n to Def. Gilead's Mot. to Dismiss, ECF No. 16 [hereinafter Pl.'s First Opp'n], at 4, is a non-starter. "Acts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *See Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982).

Plaintiff's discrimination claim under the ACA also cannot survive Gilead's Motion to Dismiss, because Plaintiff has not submitted any factual allegations making plausible the claim that Gilead qualifies as a "health program or activity" in receipt of federal funds. Section 1557 of the ACA provides in relevant part:

> [A]n individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be

> subjected to discrimination under, *any health program or activity, any part of which is receiving Federal financial assistance*, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. § 18116(a) (emphasis added). By incorporating four civil rights statutes, Section 1557 prohibits discrimination based on race, color, national origin, sex, age, or disability. *See Rumble v. Fairview Health Servs.*, No. 14-2037, 2015 WL 1197415, at *10 (D. Minn. Mar. 16, 2015). The term "[h]ealth program or activity means the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of assistance to individuals in obtaining health-related services or health-related insurance coverage." 81 Fed. Reg. 31376, 31467 (May 18, 2016). Gilead is in the business of manufacturing Harvoni, and Plaintiff does not allege that Gilead is a "health program or activity" to which Section 1557 applies. It is not, for example, "a hospital, health clinic, group health plan, health insurance issuer, physician's practice, community health center, nursing facility, residential or community-based treatment facility, or other similar entity." *Id.* Thus, Plaintiff cannot bring suit against Gilead under the ACA.

Plaintiff counters that Gilead is subject to the ACA because, by offering a patient assistance program, Gilead qualifies as "health program or activity that is administered by an executive agency or any entity established under [Title I of the ACA]," Pl.'s First Opp'n at 3 (quoting 42 U.S.C. § 18116), but that argument is unconvincing. First, Plaintiff points to no authority that stands for the proposition that a "patient assistance program" qualifies as an "entity established" under Title I of the ACA. If anything, it appears from pertinent regulations that patient assistance programs that provide cost sharing for prescription drugs otherwise covered by Medicare Part D are considered "outside the Part D benefit." 42 C.F.R. §§ 423.100, 423.308 (definition of "gross

covered prescription drug costs"). Second, even if a patient assistance program theoretically could be considered an "entity established under" Title I of the ACA, Plaintiff's allegation that Gilead "offered" a patient assistance program, without more, is not sufficient to establish that the patient assistance program at issue in this case—the one involving Harvoni—qualifies as such a covered entity.

Even if the Harvoni patient assistance program subjects Gilead to the non-discrimination provision of the ACA, Plaintiff's pleading also falls short of making out a plausible claim of discrimination. Plaintiff alleges that BOP and Gilead disqualified him from the program because he is a "prisoner." Compl. ¶ 26. The civil rights laws incorporated into the ACA do not recognize prisoners as a protected class. Moreover, Plaintiff's allegation that his exclusion from the patient assistance program was due to his race and age, *see* Compl. ¶ 47, is a bald assertion unsupported by any facts, and thus is insufficient to push his ACA claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.[10]

Thus, Plaintiff has failed to allege any plausible claim against Defendant Gilead.

### III. CONCLUSION

In light of the foregoing, the court grants in part and denies in part the Federal Defendants' Motion to Dismiss. Plaintiff's Eighth Amendment claim of deliberate indifference to his need for medical treatment may proceed, but all other claims against the Federal Defendants are dismissed. The court grants in full Defendant Gilead's Motion.

Because Plaintiff has stated a claim upon which relief can be granted concerning the BOP's refusal to treat him with Harvoni, the court will appoint pro bono counsel to represent Plaintiff.

---

[10] Plaintiff's claim that the exclusion of prisoners is a proxy for race-based discrimination because the prison population is disproportionately African-American does not get him across the line because he has offered no factual support for that contention.

The court will enter an order governing further proceedings in this matter once pro bono counsel has entered an appearance.

Dated:  March 17, 2017

Amit P. Mehta
United States District Judge